**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2756-WJM-MDB

OSCAR LUCIO-VASQUEZ,

     Plaintiff,

v.

CITY OF AURORA, and
JOSEPH CARNS, in his official and individual capacities,

     Defendants.

---

## ORDER DENYING CARNS'S AND GRANTING THE AURORA DEFENDANTS' MOTIONS TO DISMISS

---

Plaintiff Oscar Lucio-Vasquez brings this action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights against Officer Joseph Carns ("Carns"), in his individual and official capacities, and the City of Aurora ("Aurora") (jointly, "Defendants").

Before the Court are Carns's Motion to Dismiss Plaintiff's Amended Complaint ("Carns Motion") (ECF No. 46) and the Aurora Defendants'[1] Motion to Dismiss Plaintiff's Amended Complaint ("Aurora Motion") (ECF No. 48). For the reasons explained below, the Carns Motion is denied, and the Aurora Motion is granted.

---

[1] Carns files his motion in his individual capacity. (ECF No. 46 at 1.) Aurora files its motion on behalf of itself and Officer Carns in his official capacity on the basis that "[a]n official capacity claim under § 1983 is the same as a claim against a municipality." (ECF No. 48 at 3 (quoting *Rowell v. Bd. Cnty. Comm'rs*, 978 F.3d 1165, 1175 (10th Cir. 2020)).) The Aurora Motion therefore refers to multiple defendants despite both defendants being functionally the same.

## I. LEGAL STANDARDS

1.   Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).  However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

"[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

### 2.    Consideration of Body-Worn Camera Videos

Well-settled authority provides that the Court "may consider a document outside the pleadings, even in a Rule 12(b)(6) analysis, if the document is (1) mentioned in the complaint, (2) central to the claims at issue, and (3) not challenged as inauthentic." *Ramirez v. Hotel Equities Grp., LLC*, 2019 WL 5964968, at *1 (D. Colo. Nov. 13, 2019) (quotation marks and alterations omitted) (quoting *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013)).

Carns attaches body-worn camera ("BWC") footage to his motion.  (ECF No 46-1.)  He argues the Court may consider the video without converting the Motion to a motion for summary judgment under Rule 12(d) because the audio from this BWC footage is mentioned in the Amended Complaint, central to the claims, and not challenged as inauthentic.  (ECF No. 46 at 4 n.1.)  The Court agrees.

### 3.    Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once the qualified immunity defense is raised, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Id.* (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

## II. BACKGROUND[2]

### A.    The October 20, 2019, Shooting

On the night[3] of October 20, 2019, Carns responded to a report of a knife fight at 9121 E. 14th Avenue in Aurora, Colorado. (¶ 7.) While Carns was on his way to that location, dispatch aired that the Denver Police Department's "ShotSpotter" system had

---

[2] The following factual summary is drawn from the Amended Complaint (ECF No. 44), except where otherwise stated. The Court assumes the allegations in the Amended Complaint are true for the purposes of ruling on the Carns Motion and Aurora Motion. *See Ridge at Red Hawk*, 493 F.3d at 1177. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. Citations to (¶ _), without more, are citations to the Amended Complaint.

[3] There are no allegations about the time of day in the Amended Complaint, but it is apparent from the BWC footage that the shooting occurred either at night or during the early morning hours.

recorded shots fired in the area of 13th Avenue and Akron, approximately 400 feet from 9121 E. 14th Avenue.  (¶ 8.)  Upon arrival, Carns could hear a disturbance occurring behind the building and proceeded through an alley to reach the location of the disturbance.  (¶ 9.)  When he reached the back of the building, two women who were in the parking lot behind the building began running toward Carns while screaming.  (¶ 9.)  One of the women shouted, "He's got a gun."  (¶ 9.)

As shown in the BWC footage, Carns told the women to get behind him as Plaintiff emerged from the broken window of his garden-level apartment inside 9121 E. 14th Avenue.[4]  Plaintiff was holding a long, black AR-style[5] rifle in the "low ready" position.  (¶ 11.)  Carns yelled, "Drop the gun!  Drop the gun!"  (¶ 12.)  The BWC footage shows Carns pointing his service pistol and flashlight at Plaintiff as he issues these commands.   Less than two seconds later, Carns fired five rounds[6] from his service pistol, striking Plaintiff multiple times.  (¶ 13.)  Plaintiff never raised his gun toward Carns or anyone else—in fact, he was turning away from Carns when Carns began to fire.  (¶¶ 15–16.)

Plaintiff later told investigators that just prior to the incident, the window to his

---

[4] The Amended Complaint makes no allegation about when Carns drew his service pistol, but it appears from the BWC footage that he drew it before the women began to run toward him.

[5] The term "AR-15" is a reference to the Colt ArmaLite Rifle-15.  Since the patent to the gas operating system that made Colt's AR-15 so successful expired in 1977, the term "has become a catchall that includes a variety of weapons that look and operate similarly, including the Remington Bushmaster, the Smith & Wesson M&P15[,] and the Springfield Armory Saint."  Ali Watkins, John Ismay & Thomas Gibbons-Neff, *Once Banned, Now Loved and Loathed: How the AR-15 Became "America's Rifle"*, N.Y. Times, Mar. 3, 2018, https://www.nytimes.com/2018/03/03/us/politics/ar-15-americas-rifle.html.

[6] The Amended Complaint alleges Carns "fired multiple shots" (¶ 13); however, because the Court has reviewed the BWC footage, it includes the precise number of rounds in this Order.

apartment had been shattered.  (¶19.)  He believed this had been done with a pistol, so he retrieved his rifle to defend himself and his home.  (¶¶ 20–21.)  Despite retrieving his rifle for this purpose, the rifle was unloaded at the time of the incident.  (¶ 22.)

**B.    Facts Related to Municipal Liability**

In August 2021, 21CP Solutions, an independent consulting firm hired by Aurora, released a report titled "Recommendations for the Aurora Police Department" ("21CP Report").  (¶ 28.)  The 21CP report concluded, among other things, that the Aurora Police Department had inadequate training on de-escalation and appropriate use of force.  (¶ 30.)  It also provided numerous recommendations on how to improve policing and bring the Aurora Police Department's policies in line with constitutional requirements.  (¶ 31.)

On September 15, 2021, the Office of the Attorney General of the State of Colorado released a report titled "Investigation of the Aurora Police Department and Aurora Fire Rescue" ("AG Report").  (¶ 33.)  The AG Report concluded that "Aurora Police has a pattern and practice of using excessive force," primarily caused by a culture that seeks to justify use of force after the fact rather than assess whether force was necessary.  (¶¶ 34–35.)

On at least two occasions prior to the October 20, 2019, shooting, Aurora Police used deadly force under similar circumstances.  On July 30, 2018, an Aurora Police officer shot and killed Richard Gary Black—a decorated war veteran— when he was defending his home with a firearm, despite never threatening officers.  (¶ 40.)  After the fact, the Aurora Chief of Police told the press that the officer who shot Black had acted "in conformity with [Aurora Police Department] policy and custom."  (¶ 41.)  On October 10, 2019, George Huff was shot by an Aurora Police officer at his home.  (¶ 42.)  On the

night he was shot, Huff observed a group of people approaching his home at night wearing dark clothing. (¶ 43.) Not knowing they were police, Huff retrieved a shotgun to protect himself and his family. (¶ 44.) The officer who ultimately shot Huff commanded Huff to put his hands up at the same time he began shooting. (¶ 46–47.)

### III. ANALYSIS

**A.    Carns Motion**

Plaintiff argues his Fourth, Fifth, and Fourteenth Amendment rights were violated (¶ 1); however, as Carns correctly argues, the facts pleaded in the Amended Complaint do not raise claims under either the Fifth or Fourteenth Amendments. (ECF No. 46 at 6 n.3.) "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

1.    <u>Constitutional Violation</u>

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham*, 490 U.S. at 395 (emphasis removed). Under this standard, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012). Applying this

standard "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant to [an] excessive force inquiry").

The Tenth Circuit has provided four non-exclusive factors to guide courts' analysis of the second *Graham* factor.  *See Estate of Larsen ex rel Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008).  These factors, frequently referred to as the *Larsen* factors are: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."  *Id.* at 1260.  "But in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."  *Id.*

a.   *The First* Graham *Factor*

Carns argues the first *Graham* factor favors him because based on the information that was available to him in the moment, he had probable cause to believe Plaintiff had committed felony menacing.  (ECF No. 46 at 10.)  Plaintiff argues the record, including what he told investigators after the fact, shows he was merely defending his home and not committing felony menacing.  (ECF No. 49 at 8.)  Under Colorado law, a person is guilty of menacing "if, by threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily

injury."  Colo. Rev. Stat. § 18-3-206.  Menacing is generally a misdemeanor; but it is a felony if "committed by the use of a firearm, knife, or bludgeon or a simulated firearm, knife, or bludgeon."  *Id.*

Because "the use of force must be judged from the perspective of a reasonable officer on the scene, who is often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation," *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (internal quotation marks omitted), Carns had probable cause to believe that Burnett had committed a felony.  He simply could not have known in the moment what Plaintiff would later tell investigators.  Under Tenth Circuit law, "the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony*," Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).

Therefore, the Court finds this factor weighs in favor of Carns.

b.      *The Second* Graham *Factor*

"The second *Graham* factor, 'whether the suspect pose[d] an immediate threat to the safety of the officers or others,' is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017), *cert. denied* 138 S. Ct. 2650 (2018) (internal citation omitted).

(i)      The First *Larsen* Factor

The Court first considers "whether [Carns] ordered [Plaintiff] to drop his weapon, and [Plaintiff's] compliance with police commands."  *Larsen*, 511 F.3d at 1260.  It is undisputed that Carns ordered Plaintiff to "drop the gun" twice before firing his service weapon.  (¶ 12; ECF No. 46 at 5.)  It is also undisputed that from this warning to when Carns opened fire, only two seconds had passed.  (¶ 13; ECF No. 46 at 5.)  Carns

emphasizes that the situation was dangerous and rapidly unfolding before him, and he had to act quickly to protect himself and the two women.  (ECF No. 46 at 8.)  Plaintiff emphasizes that he was not given enough time to comply with Carns's order before he was shot.  (ECF No. 49 at 9–10.)

The Court finds additional facts are relevant to its consideration of this factor. This incident occurred at night, and Carns was (understandably) using a flashlight. When Plaintiff stepped into Carns's view, Carns's flashlight was shining directly on Plaintiff.  While the Court has not found a Tenth Circuit case suggesting an officer categorically must identify himself as law enforcement before using deadly force, it is also clear that a citizen's ability to perceive that orders are coming from law enforcement is important when considering whether he or she complied with police orders.

Two recent Tenth Circuit cases illustrate this point.  In *Pauly*, three officers surrounded the home of two brothers on a dark and rainy night, and the officer who shot Pauly never announced that he was law enforcement. 874 F.3d at 1202.  On these facts, the Tenth Circuit found the first *Larsen* factor favored Pauly, reasoning he "could not tell who was holding the flashlight approaching [his] house because of the dark and the rain, [and] he feared it could be intruders related to [a] prior road rage altercation." *Id.* at 1204.  In *Palacios v. Fortuna*, the Tenth Circuit found the first *Larsen* factor weighed in favor of the defendants because "Mr. Palacios was given many warnings over the course of [a sustained] pursuit and not only ignored them, but also kept picking up his gun."  61 F.4th 1248, 1258 (10th Cir. 2023).  *Palacios* noted in another portion of its analysis that "Officer Fortuna arrived with lights and sirens on in a marked patrol car,"

making it difficult to accept that the plaintiff did not know the orders were coming from police.  *Id.* at 1257.

Taking these facts in the light most favorable to Plaintiff, Plaintiff has pleaded sufficient facts to show he did not have sufficient information or sufficient time to understand that the order was coming from police.  Therefore, this factor weighs in favor of Plaintiff.

(ii)    The Second *Larsen* Factor

The second *Larsen* factor is "whether any hostile motions were made with the weapon towards the officers."  *Larsen*, 511 F.3d at 1260.  Carns makes no argument regarding this factor.  (ECF No. 46 at 11–12).  Plaintiff argues his "action of carrying a gun in the low-ready position . . . was not hostile or in any way threatening."  (ECF No. 49 at 12.)

The Court agrees with Plaintiff.  While "[a] reasonable officer need not await the glint of steel before taking self-protective action," *Larsen*, 511 F.3d at 1260, Plaintiff's mere possession of a gun does not weigh in favor Carns.  The Tenth Circuit's own words make clear that the question is whether Plaintiff made "any hostile motions . . . *with the weapon*" toward Carns, and there is no suggestion by Carns that Plaintiff did so.

This factor weighs in favor of Plaintiff.

(iii)    The Third *Larsen* Factor

The third factor is the distance separating the Carns from Plaintiff.  *Larsen*, 511 F.3d at 1260.  The parties agree Plaintiff was approximately two car lengths away from Carns at the time he was shot.  (ECF No. 46 at 11; ECF No. 49 at 12.)  While Carns emphasizes that an AR-style rifle can still cause serious injury at this distance, Plaintiff

argues Carns had ample space to take cover behind a car, identify himself as police, and wait to see if Plaintiff would drop his weapon.  (ECF No. 46 at 11; ECF No. 49 at 12.)

In *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015), the Tenth Circuit affirmed denial of summary judgment when the district court determined that a reasonable jury could find shooting Tenorio, who was armed with a knife and was walking toward officers, was unreasonable because the evidence could support a finding that he had taken no hostile action toward the officers and was not in "striking distance."  802 F.3d at 1164–65.  The *Tenorio* decision explicitly relied on the fact that the plaintiff had a knife rather than a gun, *id.* at 1165–66, and the "striking distance" of a firearm is obviously very different than that of a knife or other melee weapon.  But this factor does not automatically favor Carns because Plaintiff had a gun.  In *Pauly*, the Tenth Circuit found the third factor favored the Plaintiff even though he was armed with a gun and *had fired it* because the officer was "fifty feet away . . . [,] sequestered behind a rock wall . . . [, and] obscured by the dark and rain."  874 F.3d 1197, 1218.

The facts here lie somewhere in the middle of these two cases, so the Court considers this factor to be neutral.

(iv)   The Fourth *Larsen* Factor

The fourth factor is Plaintiff's "manifest intentions."  *Larsen*, 511 F.3d at 1260. Carns argues it was "reasonable for [him] to assume that Plaintiff's manifest intentions were to cause serious injury to [him], his fellow officers[,] and citizens around them." (ECF No. 46 at 12.)  Plaintiff argues that considering the facts in the light most favorable to him, he "manifested only an intent to protect himself and his family from possible intruders to his residence, not to harm police officers."  (ECF No. 49 at 13.)

Considering the facts in the light most favorable to Plaintiff, he has plausibly pleaded that he was merely protecting his own home, which was his legal right under the Second Amendment.  *See Pauly*, 874 F.3d 1197, 1219 ("Thus, viewing the facts in the light most favorable to plaintiffs, the manifest intention of the brothers was to protect their home after inadequate identification from the officers, which was their legal right under both the United States Constitution and New Mexico state law.")

Therefore, considering the four *Larsen* factors together, the Court finds the second *Graham* factor weighs in favor of Plaintiff.

        c.    *The Third* Graham *Factor*

Carns argues Plaintiff was "actively resisting or attempting to evade police" because he did not drop his weapon in response to Carns's orders and retreated into his apartment without dropping his gun after being shot.  (ECF No. 46 at 12.)  Plaintiff argues he was not evading arrest because he did not know he was under arrest and did not have time to comply with Carns's order to drop his gun.  (ECF No. 49 at 10.)

The Court finds this factor weighs in favor of Plaintiff.  "A suspect's subjective knowledge of whether he is encountering police is not relevant to the inquiry, but rather the question is whether 'an objectively reasonabl[e] officer could conclude, based on the facts and circumstances surrounding the situation,' that the suspect knew that he was being pursued by the police." *Palacios*, 61 F.4th at 1257 (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1133 (10th Cir. 2020)) (alteration in original).  Therefore, the Court must disregard Plaintiff's argument that he subjectively believed he was defending his home.  Still, the Court finds that considering the facts in the light most favorable to him, Plaintiff has plausibly pleaded no reasonable officer could conclude Plaintiff knew Carns was a police officer.  Unlike in *Palacios*, Plaintiff was not told numerous times by multiple

officers over an extended chase to drop his gun, nor did Carns appear in a marked
police vehicle.  (¶¶ 9, 12–13.)  Though the Tenth Circuit found in *Palacios* that this
factor weighed in favor of the officers despite their failure to identify themselves, the
additional facts that made it "reasonable under the circumstances for [the defendants] to
conclude [the plaintiff] knew he was being confronted by the police" are not present in
this action.  61 F.4th at 1258.

Considering the totality of the facts as pleaded and apparent from the BWC
footage, the Court finds Plaintiff has pleaded a cognizable excessive-force claim.

    2.   <u>Clearly Established</u>

In *McCoy v. Meyers*, the Tenth Circuit reiterated that cases need not be "factually
identical" to find clearly established law, and "factually analogous" cases may suffice.
887 F.3d 1034, 1052 (10th Cir. 2018).  None of the cases cited above squarely fit the
facts presented here, but a federal court "cannot find qualified immunity whenever [it]
find[s] a new fact pattern."  *Estate of Booker v. Gomez*, 745 F.3d 405, 427 (2014).  For
this sound reason, the Tenth Circuit has "adopted a sliding scale to determine when law
is clearly established" in which '[t]he more obviously egregious the conduct in light of
prevailing constitutional principles, the less specificity is required from prior case law to
clearly establish the violation.'"  *Reeves*, 745 F.3d at 427 (quoting *Casey*, 509 F.3d at
1284) (alteration in original).

With this in mind, the Court considers the facts of *Pauly* again.  In that case, the
Tenth Circuit found a constitutional violation based on the following facts:

- The officers approached the Pauly brothers' home on a dark rainy night;

- Two of the officers inadequately identified themselves, impeding the

Paulys' ability to recognize the orders were coming from law enforcement and comply;

- The officer who shot Samuel Pauly neither identified himself as law enforcement nor issued a verbal warning prior to shooting;

- The officer who shot Samuel Pauly was 50 feet away and hiding behind a rock wall;

- The Paulys armed themselves to defend their home from perceived intruders and fired "warning shots" in the officers' direction; and

- Samuel Pauly was pointing his weapon out the window at an officer when he was shot.

874 F.3d at 1202, 1203–1205.  In this case, Carns approached the scene of an ongoing confrontation at Plaintiff's residence without identifying himself as law enforcement and shot Plaintiff after he did not drop his rifle within two seconds of Carns's order to do so.

In some notable ways, this case is even more troubling, as it concerns the Fourth Amendment, this case is even more troubling than *Pauly*.  Unlike in *Pauly*, Plaintiff did not fire his weapon at anyone, and he never pointed it at Carns or any other member of law enforcement—indeed he never had the time to undertake any of these actions.  Nor was there a protracted standoff with law enforcement officers like in *Pauly,* who in that case were fired upon by plaintiffs more than once.

Despite these and other minor factual differences, for purposes of determining whether the excessive force claim here was clearly established, the Court finds this action and *Pauly* are "factually analogous."  As in *Pauly*, the facts as pleaded here depict a police encounter in which an officer's failure to properly announce himself on a

dark night made it extremely difficult, if not impossible, for an armed citizen who was at his residence to comply with police orders in under two seconds, resulting in that citizen being shot.

Therefore, the Court finds the constitutional violation was clearly established as of *Pauly*, which was issued on October 31, 2017, nearly two years before the October 20, 2019, shooting.

**B.    Aurora Motion**

Aurora first argues that it cannot be liable for Carns's conduct because Plaintiff's constitutional rights were not violated.  (ECF No. 48 at 3.)  Because the Court has already rejected the same argument from Carns, it rejects Aurora's argument.  *See supra*, Part III.A.1.

Aurora also argues that, even if Carns did violate Plaintiff's constitutional rights, Plaintiff has not pleaded facts sufficient to subject it to liability.  (ECF No. 48 at 4–14.)

1.    Municipal Liability

A local government unit can be liable for damages under 42 U.S.C. § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  The Supreme Court has thus "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury," thereby "ensur[ing] that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," rather than holding the municipality liable simply because it employed a constitutional wrongdoer.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,

520 U.S. 397, 403–04 (1997).

The relevant policy or custom can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted; alterations incorporated).  But, whatever species of policy or custom is alleged,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan Cnty.*, 520 U.S. at 404 (emphasis in original).

Plaintiff asserts municipal liability on three theories: informal custom, failure to train, and ratification.  (*See* ECF No. 48 at 4–14.)  Aurora argues none of these theories are supported by the facts alleged in the Amended Complaint.  (*Id.*)  For the reasons discussed below, the Court agrees with Aurora.

2.   <u>Informal Custom</u>

"[A]n act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory

that the relevant practice is so widespread as to have the force of law." *Bryan Cnty.*, 520 U.S. at 404 (internal quotation marks omitted); *see also City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (establishing an informal policy or custom requires the plaintiff to show that the misconduct was widespread—*i.e.*, that it involved a series of decisions). "With formal, unwritten policies, customs, or practices, the plaintiff can plead a pattern of multiple similar instances of misconduct; 'no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible.'" *Arakji v. Hess*, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).

Plaintiff points to two similar prior instances of excessive force.  (¶¶ 40–52.)  So few examples is simply not enough to show that Aurora has a practice that is "so widespread as to have the force of law."  *Bryan Cnty.*, 520 U.S. at 404; *see also Waller*, 932 F.3d 1277, 1290 (10th Cir. 2019) (finding that allegations "describing only one similar incident . . . fall[s] far short of plausibly alleging a 'widespread practice.'").

Plaintiff also points to the 21CP Report and the AG Report, arguing these reports are evidence of a pattern or practice of Aurora police officers using excessive force. (ECF No. 51 at 9.)  But the generalized conclusions of these reports are not substitutes for specific *factual* allegations of similar unlawful conduct.  *See Ridge at Red Hawk*, 493 F.3d at 1177.

### 3.   Failure to Train

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir.

1997) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).  The "well

established" elements of a § 1983 claim for inadequate use-of-force training for police

require a showing:

> (1) the officers exceeded constitutional limitations on the use
> of force; (2) the use of force arose under circumstances that
> constitute a usual and recurring situation with which police
> officers must deal; (3) the inadequate training demonstrates
> a deliberate indifference on the part of the city toward
> persons with whom the police officers come into contact; and
> (4) there is a direct causal link between the constitutional
> deprivation and the inadequate training.

Id.

"However, a municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train."  *Erickson v. City of Lakewood, Colo.*,

489 F. Supp. 3d 1192, 1207 (D. Colo. 2020) (alterations omitted) (quoting *Connick v.

Thompson*, 563 U.S. 51, 61 (2011)); *see also Oklahoma City v. Tuttle*, 471 U.S. 808,

822–23 (1985) (plurality opinion) (observing that a policy of inadequate training is "far

more nebulous, and a good deal further removed from the constitutional violation, than

was the policy in *Monell*.").

"To satisfy the stringent deliberate indifference standard, [a] pattern of similar

constitutional violations by untrained employees is ordinarily necessary."  *Waller*, 932

F.3d at 1285.  Plaintiff again relies on two prior examples of similar conduct by Aurora

police officers, but two examples is (again) not enough to adequately plead a failure to

train theory.  (¶¶ 40–52.)  Plaintiff argues the 21CP Report and the AG Report's

conclusions tend to show critical flaws in the training as of 2019.  (ECF No. 51 at 9–12.)

The Court has addressed this issue in a similar case that attempted to rely on the

21CP Report.  *See Marck v. City of Aurora*, 2022 WL 889175 (D. Colo. Mar. 25, 2022.)

In that case, the Court explained that the 21CP report was "irrelevant" to whether Aurora was on notice of the inadequate training at the time of the underlying incident because the report was issued two years later.  *Id.* at *11.  Whether Aurora was on notice is important because "deliberate indifference" (*i.e.*, deliberate conduct) is required to impose liability on Aurora.  *Bryson*, 627 F.3d at 788.  Because the AG Report was also issued *after* the October 20, 2019, shooting, it is also irrelevant to whether Aurora was on notice of the issues it identifies.

       4.    Ratification

      "Ratification can be found when the employees were given authority for the action, subject to the review and approval of a final policymaker, and when the final policymaker approves of the decision and the basis for the decision."  *Cobruno v. Diggins*, 2018 WL 10215848, at *10 (D. Colo. 2018) (citing *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010)).  The final decisionmakers' approval must precede the violative action, and the Tenth Circuit has rejected ratification based on conduct after the violation has occurred.  *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[les] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation.") (emphasis in original).

      Plaintiff's ratification theory fails because it is entirely premised on statements made by high-ranking members of Aurora's police department about other incidents after those incidents had occurred.  (ECF No. 51 at 3.)  Plaintiff points to no allegations relating to approval of *Carns's actions prior to those actions being taken*.  (*Id.*)  Even assuming Plaintiff has identified final policymakers, his allegations fail to state a plausible ratification theory.

**IV. CONCLUSION**

For the reasons set forth above, the Court Orders as follows:

1.  Carns's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 46) is DENIED;

2.  The Aurora Defendants' Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 48) is GRANTED;

3.  The Aurora Defendants will be entitled to judgment in their favor and against Plaintiff when the Clerk enters final judgment at the conclusion of this action;

4.  The Stay of this action (ECF No. 59) is hereby LIFTED; and

5.  Counsel for Plaintiff and Carns shall jointly contact the Chambers of Magistrate Judge Dominguez Braswell by no later than **April 13, 2023**, to schedule a Status Conference, or such other proceeding as Judge Dominguez Braswell deems appropriate to move this action forward.

Dated this 11th day of April, 2023.

BY THE COURT:

William J. Martinez
Senior United States District Judge